## IN RE DEANA E. ET AL.*
### (AC 20376)

Foti, Spear and Pellegrino, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued October 16—officially released December 26, 2000

*Dale H. King*, for the appellant (respondent father).

*Jane R. Rosenberg*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Opinion*

SPEAR, J. The respondent father, Celso S.,[1] appeals from the judgments of the trial court terminating his parental rights with respect to his three children, C, S and A.[2] The respondent claims that the court improperly (1) denied his motion to bifurcate the proceedings and (2) found that the commissioner of children and families (commissioner) proved by clear and convincing evidence that the respondent had failed to achieve personal rehabilitation within the meaning of General Statutes § 17a-112 (c) (3) (B).[3] We affirm the judgments of the trial court.

In a comprehensive memorandum of decision, the court found the following facts. On March 10, 1995,

[1] The court also terminated the parental rights of the respondent mother. She has not appealed from these judgments. We refer in this opinion to the respondent father as the respondent.

[2] The court terminated the parental rights of the respondent mother with respect to her six children, three of whom, C, S and A, are children of the respondent father and are the subjects of this appeal. The other three children, D, Y and M, are children of the respondent mother and a different father. The opinion in the appeal by that father as to the termination of his parental rights with respect to D, Y and M is reported as *In re Deana E.*, 61 Conn. App. 185, 763 A.2d 37 (2000). Our reference in this opinion to "the children" refers to all six children unless otherwise noted.

[3] General Statutes § 17a-112 (c) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b that such efforts are not appropriate, (2) that termination is in the best interest of the child, and (3) that . . . (B) the parent of a child who . . . (2) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and such parent has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

the department of children and families (department) received a referral regarding D, a half sibling of the respondent's children. The department ascertained that the mother and the respondent were living together in squalor. The house was infested with cockroaches, piles of clothes were strewn about the house and there were no mattresses or sheets for the children to sleep on. During a subsequent investigation, the department determined that the respondent had severely beaten D and two other half siblings, Y and M, with an electrical cord because they continued to jump on a bed after he had asked them to stop.

To prevent the removal of her children from her care, the mother signed an agreement with the department in which she agreed that the respondent would move out of the home for a period of time and would not have contact with the children. As a result of the beating incident, the respondent was charged with two counts of assault in the second degree, three counts of risk of injury to a child and one count of assault in the third degree. As part of the criminal proceeding, a restraining order was issued on March 21, 1995, which provided that the respondent was not to have any contact with the children during the pendency of his criminal case. The respondent violated the order almost immediately when he visited the mother and the children within a week of the order's issuance. D, Y and M later revealed in therapy that the respondent continued to abuse them physically. The respondent was convicted on August 2, 1995, of one count of assault in the second degree and one count of risk of injury to a child.

On August 22, 1995, the commissioner filed neglect petitions alleging that D, Y and M and the respondent's own children, C, S and A, were being denied proper care and attention physically, educationally, emotionally or morally and that the children were being permitted to live under conditions, circumstances or associations

injurious to their well-being.[4] Prior to the granting of the neglect petitions, an order of temporary custody was requested by the commissioner. Temporary custody of the children was granted by the court on October 6, 1995, after the mother left the children with an inappropriate caregiver whose own children recently had been removed from their home because of physical abuse. M reported that on the weekend prior to the granting of the temporary custody order, the respondent had pushed him against the wall several times and caused a large bump on his head that remained for more than one week. D stated that on that same weekend, the respondent had hit her on her back, legs and hands with the electrical cord and that he had done this on prior visits. Finally, Y reported that the respondent had also hit her on the back, legs and hands with the cord on numerous occasions. The children all confirmed that their mother had not kept them away from the respondent.

While in foster care, the children received therapy. During therapy, D and Y revealed other occurrences of abuse. D revealed that her mother forced her to cook for the children. On one occasion when her mother was dissatisfied with the meal, the mother threw the food on the floor, at which point the respondent beat D with an electrical cord. Y revealed that the respondent would also beat her mother if she tried to intervene while the respondent was beating Y.

The department offered the respondent extensive services, but he chose not to take advantage of the numerous opportunities that he was given to improve his parenting skills. The department offered him participation in a parent aid program that commenced in Septem-

---

[4] A was not born until October 2, 1995, after the commissioner had filed the neglect petitions concerning the other five children on August 22, 1995. The commissioner, therefore, filed a neglect petition with respect to A on October 6, 1995.

ber, 1995, which he refused. In October, 1995, the department also referred him to Winthrop Family Support Center for anger management counseling and a men's support group. He did not complete those programs. He received couples counseling until he moved to Puerto Rico in the spring of 1996. The department also referred him to a men's support group and an English as a second language program offered in December, 1996. The respondent did not complete those programs. Furthermore, the respondent was offered individual counseling through Catholic Charities in 1997, but he did not attend. In addition, he failed to attend classes at the Institute for Hispanic Families. On February 4, 1997, a court committed the children to the care and custody of the commissioner as neglected children.

On August 19, 1998, the commissioner filed petitions for the termination of parental rights of the respondent with respect to his three children after reunification efforts with the mother had failed.[5] With respect to the

[5] The mother had completed numerous programs that she had been referred to by the department. As part of the department's reunification plan, on October 31, 1997, C and S were reunified with their mother, who was now living with a man named Jorge. Subsequently, A was reunified with her mother on December 25, 1997. The mother had signed an agreement with the department that she would provide appropriate supervision, refrain from using physical discipline and provide a safe, stable and nurturing environment for her children.

On January 9, 1998, the three children again were removed from their mother's care the day after the department received a referral from child guidance regarding the respondent's child, C. The mother had told one of the counselors at child guidance that she could not come to her appointment that day because a tall black man had beaten C. When the department worker went to the school, she found that C was absent and had missed the previous day as well. When the department worker arrived at the mother's apartment, she found that the C had a large bruise, in the shape of an adult hand print, on his cheek. The mother stated that an eight year old child named Gabby had hit C when she left the child with a baby-sitter, Doris, whom the department had not approved as a caretaker. When questioned by the worker, the child first said that Gabby had hit him, but then C changed his story, saying that it was a tall white male who had hit him. A physician who examined C found numerous contusions on his face, back and thigh,

respondent, the petitions alleged that a court had found, in a prior proceeding, that his children were neglected and that the respondent had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time considering the age and needs of the children, he could assume a responsible position in the life of his children.[6] General Statutes § 17a-112 (c) (3) (B).

On December 4, 1998, the respondent moved to bifurcate the adjudicatory phase of the termination proceeding from the dispositional phase. The respondent claimed that to balance the interests involved, bifurcation of the proceedings was required. The court, *Munro, J.*, denied the respondent's motion to bifurcate.

The court, *Rogers, J.*, found by clear and convincing evidence that the respondent had failed "to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering

and a bruise in the shape of an adult shoe print on the child's buttocks.

When the worker questioned Doris, against whom the commissioner had filed a neglect petition regarding her own children, she confirmed that she had been baby-sitting C on January 6, 1998. She stated that the child had no bruises when Jorge picked up the child at approximately 6:30 p.m. Significantly, Jorge confirmed that he did not observe any bruises on the child when he picked him up at Doris' house. When Jorge picked up C, Doris told him that C had engaged in sexualized behavior and made several inappropriate comments. In the presence of Doris, Jorge slapped C on the mouth and told Doris that he would take care of the problem at home.The mother stated that she did not know how the child had gotten the bruises. Although C never confirmed that Jorge had beaten him, he did state that Jorge was "always mean" and yelled at him constantly.

As a result of the failure of the efforts to reunify C, S and A with their mother, the commissioner filed petitions for the termination of the parental rights of the mother as to all of the children, of the parental rights of the respondent as to his three children and as to the father of the other three children as to them. See footnote 2.

[6] The petition also alleged the statutory grounds of abandonment and no ongoing parent-child relationship. At the conclusion of the trial, the petitioner withdrew the claim of abandonment, and the court rejected the no ongoing parent-child relationship claim.

the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (c) (3) (B). The court found that "[a]s of the filing of the termination petitions, [the respondent] had failed to complete any of the parenting classes, parent aid programs, anger management courses, or men's support groups that were offered to him by [the department. The respondent] has made numerous excuses for failing to complete any of these programs. These excuses included his moving to Puerto Rico as part of a plan to reunite him with the children once [the department] returned the children to the mother, his moving to Vernon to protect himself from the family of [the mother's] boyfriend and, finally, timing conflicts between his employment and these programs. The fact still remains, however, that this father by his own choice of priorities has not taken advantage of any of the services that would demonstrate a genuine, sustained effort by him to become a competent parent." The court terminated the parental rights of the respondent pursuant to § 17a-112 (c) (3) (B) for the failure of the respondent to achieve personal rehabilitation.[7] This appeal followed.

I

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Galen F.*, 54 Conn. App. 590, 594, 737 A.2d 499 (1999);

[7] See footnote 3.

see also *In re Roshawn R.*, 51 Conn. App. 44, 52, 720 A.2d 1112 (1998). "A petition to terminate parental rights consists of two phases . . . . It is not necessary, however, that the two phases be the subject of separate hearings. One unified trial . . . is permissible." (Citations omitted.) *In re Eden F.*, 48 Conn. App. 290, 305–306, 710 A.2d 771 (1998), rev'd on other grounds, 250 Conn. 674, 741 A.2d 873 (1999). Practice Book § 33-3 (b) provides that "[i]n the discretion of the judicial authority, evidence on adjudication and disposition may be heard in a non-bifurcated hearing, provided disposition may not be considered until the adjudicatory phase has concluded."

Our standard of review of a court's decision to bifurcate a termination of parental rights hearing is well settled. The decision whether to bifurcate a termination of parental rights proceeding lies solely within the discretion of the trial court. See *State* v. *Anonymous*, 179 Conn. 155, 172–74, 425 A.2d 939 (1979); see also *In re Tabitha P.*, 39 Conn. App. 353, 360 n.6, 664 A.2d 1168 (1995). "In reviewing claims that the trial court abused its discretion the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness; the ultimate issue is whether the court could reasonably conclude as it did . . . ." (Internal quotation marks omitted.) *In re Jose C.*, 11 Conn. App. 507, 508, 512 A.2d 1239 (1987).

The respondent claims that the court improperly denied his motion to bifurcate the adjudicatory phase of the termination proceeding from the dispositional phase. The respondent provides several arguments supporting his claim that the court's denial was improper.

A

First, the respondent argues that when the state seeks to terminate the parent-child relationship, the court

should employ the balancing test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), to determine whether bifurcation is necessary to satisfy the procedural safeguards required by the federal due process clause.[8] See *Santosky* v. *Kramer*, 455 U.S. 745, 754, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); see also *In re Alexander V.*, 223 Conn. 557, 560, 613 A.2d 780 (1992). The respondent thus argues that the court violated his right to due process under the fourteenth amendment to the United States constitution by failing to apply the *Mathews* test when it denied his motion to bifurcate. We disagree.

"[T]he United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); see also *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 295, 455 A.2d 1313 (1983) (noting that it is both a fundamental right and the policy of this state to maintain the integrity of the family)." *In re Eden F.*, supra, 48 Conn. App. 306–307. "Accordingly, it has been held that the due process clause of the fourteenth amendment to the United States constitution applies when a state seeks to terminate the relationship between parent and child." *In re Alexander V.*, supra, 223 Conn. 560. The United States Supreme Court has held that the clear and convincing standard "adequately conveys to the factfinder the level of subjective certainty about his factual conclu-

---

[8] The *Mathews* balancing test factors are: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews* v. *Eldridge*, supra, 424 U.S. 335.

sions necessary to satisfy due process." *Santosky* v. *Kramer*, supra, 455 U.S. 769.

We conclude that the court did not abuse its discretion when it declined to apply the *Mathews* balancing test and in denying the respondent's motion to bifurcate the termination hearing. The statute protects the due process rights of the respondent by requiring clear and convincing evidence in the adjudicatory phase. Using the balancing test of *Mathews*, therefore, is unnecessary and superfluous. In addition, Practice Book § 33-3 specifically allows the court, at its discretion, to combine both phases into one hearing. We find that it was reasonable for the court to conclude that another court would not consider evidence inappropriately. Moreover, there is nothing in the record to indicate that the court improperly considered dispositional evidence in the adjudicatory phase.

## B

The respondent's second argument in support of his claim that the court improperly denied his motion to bifurcate is that the court improperly disregarded testimony of a clinical psychologist regarding the court's inability to separate adjudicatory and dispositional evidence. Specifically, the respondent argues that because the state did not rebut the clinical psychologist's testimony, the court improperly rejected the respondent's claim that in this case dispositional evidence would prejudice the court's consideration of the grounds for termination in the adjudicatory phase.[9] We do not agree.

[9] The dispositional evidence that the respondent argues "severely prejudiced" the court during the adjudicatory phase was the testimony of the foster mothers. They testified that they would allow the respondent to visit his children after his parental rights were terminated and the foster families had adopted the children. The respondent argues that "[k]eeping the children with the foster mother where they have flourished and foreseeing visitation similar to a divorce situation with their father [whom] they very much enjoy [seeing] is just too tempting a resolution to allow a court to hear before deciding adjudication and should not have been permitted."

"The trial court . . . is not bound by the uncontradicted testimony of any witness . . . and is in fact free to reject such testimony. . . . The trier is the judge of the credibility of all the witnesses and the weight to be given their testimony and, therefore, has the right to accept part or disregard part of a witness' testimony." (Citations omitted.) *In re Hector L.*, 53 Conn. App. 359, 366, 730 A.2d 106 (1999). Here, the court was not obligated to give particular weight to the psychologist's testimony regarding the prejudicial effect of dispositional evidence on the decision of the court in the adjudicatory phase. The court, as the trier of fact, was in the best position to determine the credibility of the psychologist's testimony.

The respondent also argues that the court improperly disregarded the psychologist's testimony and denied the respondent's motion to bifurcate because " '[a] judge has not such control over his mental faculties that he can definitely determine whether or not inadmissible evidence he has heard will affect his mind in making his decision.' *Barbieri* v. *Cadillac Construction Corp.*, 174 Conn. 445, 451, 389 A.2d 1263 (1978)." We disagree.

The respondent's reliance on *Barbieri* is misplaced, as the facts in *Barbieri* greatly differ from the facts in the present case. In *Barbieri*, the court's finding that the plaintiff " 'had been Democratic Town Chairman of New Haven for many years and was an important and powerful political leader in the State of Connecticut' " was made without supporting evidence. Id., 450. The court improperly made this finding regarding character because it was not supported by the evidence and was not a finding that could be judicially noticed. Id. The finding was, thus, struck by the reviewing court. In contrast, evidence exists in the record to support all of the court's findings in this case. Therefore, *Barbieri* does not apply.

Furthermore, the respondent concedes that the court has discretion in deciding whether to bifurcate a termination of parental rights hearing. *In re Jose C.*, supra, 11 Conn. App. 508. He has shown no abuse of that discretion here.

## C

The respondent's third argument in support of his claim that the court improperly denied his motion to bifurcate is that the opportunity for the court to consider the best interests of the children in the adjudicatory phase is a structural defect in nonbifurcated hearings. Specifically, the respondent claims that the court's refusal to bifurcate the trial created a structural defect that mandates reversal. He reasons that such a defect is not susceptible to an abuse of discretion or harmless error analysis because "structural error renders a trial fundamentally unfair." Because the court had the opportunity to use dispositional evidence in the adjudicatory determination, the respondent argues that a consideration of the children's best interests could have tainted the court's finding that there were grounds for termination. The respondent posits that the opportunity to "become partial for the children" in the adjudicatory phase is equivalent to "the appearance of partiality which attacks the very foundation of our judiciary." This claim is without merit.

In *State* v. *Anderson*, 55 Conn. App. 60, 72, 738 A.2d 1116, cert. granted on other grounds, 251 Conn 926, 742 A.2d 363 (1999), we stated: "There is a unique type of error that cannot be reviewed in terms of trial court discretion or abuse of discretion . . . because it is a defect in the trial mechanism itself that defies such an analysis and requires automatic reversal. In such cases, analysis in terms of whether discretion was abused cannot be utilized because the defect is incurable and not correctable." Examples of such structural errors or

defects are "when the judge has a financial interest in the outcome of a trial despite the lack of any indication that his bias affected the outcome; *Tumey* v. *Ohio*, 273 U.S. 510, 535, 47 S. Ct. 437, 71 L. Ed. 749 (1927); or when there is a systematic exclusion from a grand jury of blacks; *Vasquez* v. *Hillery*, 474 U.S. 254, 263–64, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986); or when a defendant has been denied the assistance of counsel; *Glasser* v. *United States*, 315 U.S. 60, 76, 62 S. Ct. 457, 86 L. Ed. 680 (1942); or when inherently adverse publicity has tainted the trial; *Sheppard* v. *Maxwell*, 384 U.S. 333, 351–52, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); or when there exists purposeful discrimination in the selection of jurors. *Whitus* v. *Georgia*, 385 U.S. 545, 549–50, 87 S. Ct. 643, 17 L. Ed. 2d 599 (1967)." *State* v. *Anderson*, supra, 73.

The respondent offers no authority, and we are not aware of any, to support his claim that the denial of his motion to bifurcate created a structural defect in the proceedings. Accordingly, the abuse of discretion standard applies here. See, e.g., *State* v. *Davis*, 51 Conn. App. 171, 180, 721 A.2d 146 (1998) (no abuse of discretion in denying motion to bifurcate criminal trial on count that required proof of prior felony); *O'Shea* v. *Mignone*, 50 Conn. App. 577, 579, 719 A.2d 1176, cert. denied, 247 Conn. 941, 723 A.2d 319 (1998) (no abuse of discretion where court bifurcated personal injury trial as to liability and damages).

Moreover, Practice Book § 33-3 (b) authorizes a non-bifurcated hearing. We decline to find that a court taints a proceeding with structural error when the rules of practice permit the court's action. We are satisfied that no structural defect existed.

We conclude that none of the respondent's bifurcation claims has merit. Accordingly, the court did not

abuse its discretion in denying the respondent's motion to bifurcate the hearing.

## II

The respondent also claims that the court improperly found that the commissioner proved by clear and convincing evidence that the respondent failed to achieve personal rehabilitation within the meaning of § 17a-112 (c) (3) (B).[10] We disagree.

"The standard for review on appeal [from a termination of parental rights] is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous." (Citations omitted; internal quotation marks omitted.) *In re John G.*, 56 Conn. App. 12, 16, 740 A.2d 496 (1999).

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *In re Danuael D.*, 51 Conn. App. 829, 836, 724 A.2d 546 (1999).

Section 17a-112 (c) (3) (B) allows a court to terminate parental rights when the parent has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child

---

[10] See footnote 3.

. . . ." General Statutes § 17a-112 (c) (3) (B). "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." (Internal quotation marks omitted.) *In re Migdalia M.*, 6 Conn. App. 194, 203, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). The statute does not "require the parent to be able to assume full responsibility for a child, without the use of available support programs." Id. "Our Supreme Court has held that § [17a-112] (b) (2) [now § 17a-112 (c) (3) (B)] requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time." (Internal quotation marks omitted.) *In re Danuael D.*, supra, 51 Conn. App. 837–38; see also *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873 (1999).

After reviewing the court's decision and the record, we conclude that there was sufficient evidence to support the court's conclusion, by clear and convincing evidence, that the respondent had failed to achieve personal rehabilitation. The record shows that the respondent had ample opportunity during the adjudicatory period to rehabilitate himself, but chose not to do so. The court's findings that the respondent had "failed to complete any of the parenting classes, parent aid programs, anger management courses, or men's support groups that were offered to him by [the department]" and that the respondent "by his own choice of priorities has not taken advantage of any of the services that would demonstrate a genuine, sustained effort by him to become a competent parent" were not clearly erroneous.

The judgments are affirmed.

In this opinion the other judges concurred.